**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| Phil and Martha Tompkins, derivatively on behalf of K-V Pharmaceutical Company, ) ) ) | |
| Plaintiffs, ) | Civil Action No. 11-1982-JAR |
| ) ) | |
| v. ) | |
| ) | |
| GREGORY J. DIVIS, JR., SCOTT ) GOEDEKE, ROBERT E. BALDINI, ) GREGORY BENTLEY, MARK A. DOW, ) DAVID S. HERMELIN, JOSEPH D. ) LEHRER, DAVID SIDRANSKY, M.D., ANA ) I. STANCIC, and ARNOLD L. HERMELIN ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | **DEMAND FOR JURY TRIAL** |
| ) | |
| K-V PHARMACEUTICAL COMPANY, ) | |
| ) | |
| Nominal Defendant. ) | |

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiffs Phil and Martha Tompkins, by and through their undersigned attorneys bring this action derivatively on behalf of and for the benefit of K-V Pharmaceutical Company, ("K-V" or the "Company"), and submit this Amended Verified Shareholder Derivative Complaint against the members of K-V's Board of Directors (the "Board"), Arnold L. Hermelin (a major shareholder who is a close blood relation to Board member David Hermelin, both part of the Hermelin family clan which controls the Company as described below) and certain of the Company's officers, seeking to remedy their breaches of fiduciary duties from at least February 14, 2011 to the present (the "Relevant Period"). Plaintiffs allege, upon personal knowledge as to themselves and their own acts, and, as to all other matters, upon information and belief based upon their attorneys' investigation, which included, but was not limited to a review

of United States Securities and Exchange Commission ("SEC") filings, news reports, press releases, court filings, and other publicly available information regarding the Company, the above and as follows:

## NATURE OF THE ACTION

1.      This is a derivative action brought on behalf of K-V and seeking relief on behalf of K-V against the members of K-V's Board of Directors (the "Board" or "Director Defendants") and certain officers (the "Executive Defendants", and, collectively with the Director Defendants, the "K-V Defendants") and Arnold L. Hermelin ("A. Hermelin," and collectively with the K-V Defendants, "the Individual Defendants") for their breaches of fiduciary duty and other misconduct during the Relevant Period that have caused and will continue to cause substantial harm to the Company.

2.      The K-V Defendants breached the fiduciary duties they owed and owe to K-V by, *inter alia*, making, and allowing the making of, materially false and misleading statements to the investing public, omitting to state material facts necessary to render statements made not misleading, consciously failing to establish and maintain internal controls which would have prevented the Company from disseminating materially false and misleading statements, and by consciously failing to properly manage and oversee the Company.  These false and misleading statements disseminated to the investing public related to the Company's liabilities and losses (which the K-V Defendants misstated in the Company's public filings, causing the Company to have to issue a damaging restatement of its publicly reported financial results), as well as with respect to the Company's key drug, Makena, the purported lack of competition with the generic version of that drug due to false statements concerning the FDA's regulation of competitors, the pricing of and distribution program for Makena, and the likelihood of financial success for the

2

Company.  The import of the K-V Defendants' false and misleading statements concerning Makena was that this drug would be a financial windfall for the Company due to supposed FDA restrictions on competitors (that the FDA expressly disavowed) and that the Company's programs that would ensure that every eligible patient would have access to Makena (though that was far from the case).  These materially false and misleading statements, and the concealment of the need to restate K-V's publicly reported financial statements and its true financial position, caused the Company's stock price to be artificially inflated during the Relevant Period.

3.     Consequently, K-V has been damaged and continues to be damaged, which damages this suit seeks to recover on behalf of the Company.  Damages to the Company include investigatory costs, its diminished reputation, and litigation costs it has incurred and will incur, and liability and adverse judgments it likely will incur for violations of federal securities fraud laws, including costs for defending, and liability which likely will result from, federal securities fraud class action litigation filed against K-V, including the actions entitled *Julianello v. K-V Pharmaceutical Company, et al.* (No. 4:11-cv-01816-AGF), *Mukku v. K-V Pharmaceutical Company, et al.* (No. 4:11-cv-01888-CEJ), and *Cheong v. K-V Pharmaceutical Company, et al.* (No. 4:11-cv-01905-RWS), filed in the United States District Court for the Eastern District of Missouri on, respectively, October 19, October 31, and November 2, 2011.

4.     The K-V Defendants' knowing failure to establish and maintain internal controls, which has and will cost the Company dearly, is further evidenced by the K-V Defendants' admission that, **"We have material weaknesses in our internal control over financial reporting and cannot assure you that additional material weaknesses will not be identified in the future"**, as admitted in the Company's fiscal year 2011 annual report on Form 10-K/A,

filed with the SEC on December 8, 2011("2011 Form 10-K/A").[1]  As a result of the Company's
need to restate its publicly reported financial results for the fiscal year ended March 31, 2011, as
well as for the quarters ended December 31, 2010 and June 30, 2011, in light of, *inter alia*, the
K-V Defendants' misstatements concerning the Company's liabilities and losses.  Moreover, the
K-V Defendants' breaches of fiduciary duty have left the Company in such a precarious financial
position that it has had to admit that, **"There is substantial doubt about the Company's ability
to continue as a going concern"** (as stated in the Company's recent quarterly reports on Forms
10-Q and 10-Q/A, including most recently in its Form 10-Q filed with the SEC on February 9,
2012).

5.      Further, as admitted by the K-V Defendants in the Company's quarterly report
filed on Form 10-Q with the SEC on February 9, 2012, "As of December 31, 2011, these
**material weaknesses** [in the Company's internal controls over financial reporting, identified in
2011 Form 10-K/A] **have not been remediated**.  The K-V Defendants further admitted in the
February 9, 2012 Form 10-Q:

> ***Material weakness in entity-level controls.***[2]  We did not maintain an effective
> control environment or entity-level controls with respect to risk assessment,
> information and communications and monitoring components of internal control.
> **We did not**:
>
> > a.      **design adequate controls to identify and address risks critical
> > to financial reporting, including monitoring controls and
> > controls to ensure remediation of identified deficiencies**.
>
> **Such deficiencies resulted in a reasonable possibility that a material
> misstatement of our annual or interim consolidated financial statements will
> not be prevented or detected on a timely basis** and contributed to the other
> material weaknesses described below.

---

[1] All emphasis herein is added unless otherwise stated.
[2] This sentence emphasized in the original.

*Material weakness surrounding financial statement preparation and review procedures and application of accounting principles.*[3]  Our policies and procedures did not adequately address the financial reporting risks associated with the preparation and review of our financial statements.  **We did not**:

    a.    design controls over access, changes to and review of our spreadsheets used in the preparation of financial statements;

    b.    design controls necessary to ensure that information for new and modified agreements was identified and communicated to those responsible for evaluating the accounting implications; and

    c.    **develop policies and procedures necessary to adequately address the financial reporting risks associated with the application of certain accounting principles and standards**.

**Such deficiencies resulted in a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis**.

6.    K-V is a specialty pharmaceutical company that develops, manufactures, acquires and markets branded and generic/non-branded prescription pharmaceutical products.  It operates in three segments: brand products, specialty generics, and specialty raw materials.  K-V has conducted its branded pharmaceutical operations through its subsidiary, Ther-Rx Corporation ("Ther-Rx") and its generic, non-branded operations through its subsidiary, ETHEX Corporation ("ETHEX"), now known as K-V Generic Pharmaceuticals, Inc.  The Company and its subsidiaries, Ther-Rx and ETHEX, entered into a consent decree with the U.S. Food & Drug Administration ("FDA") in 2009 for making and distributing adulterated and unapproved drugs.  According to the decree, K-V was prohibited from making or shipping drugs until the Company received FDA approval.  In 2010, ETHEX pleaded guilty to two felony counts for failing to report to the FDA that it misbranded drugs and distributed over-strength morphine tablets that posed a serious risk of harm to patients.  The Company was forced to pay over $28 million in fines, forfeitures, and restitution.  As a result of violating the decree, Marc S. Hermelin, ("M.

---

[3] This sentence emphasized in the original.

Hermelin") the former Chief Executive Officer and Chairman of K-V (and the father of Defendant David Hermelin ("D. Hermelin") and brother of Defendant A. Hermelin) was prohibited from participating in federal health programs including Medicare and Medicaid.  In addition, M. Hermelin pled guilty to two misdemeanor violations of the Food, Drug & Cosmetics Act and was slapped with a $1 million fine, ordered to forfeit $900,000 and incarcerated for a 30-day sentence in the St. Louis County Jail.  Given that M. Hermelin remained a significant K-V shareholder, and the Board's lack of internal controls which allowed this criminal malfeasance to take place (and which lack of internal controls persisted and was to result in the wrongdoing set forth herein), K-V faced the risk of being barred from participating in Medicare and Medicaid and other federal health programs.  The instant action concerns the Individual Defendants' latest unlawful misbehavior and mismanagement of the Company.  In addition to this criminal scandal, the Company began experiencing financial difficulties which resulted in mass layoffs.  In March of 2010, K-V laid off 289 employees, cutting nearly 40% of its workforce.  Despite the Company's financial woes, the Board still found the cash to give hefty and undeserved raises to themselves and the Company's executives, including Defendant Divis (the Company's current Chief Executive Officer ("CEO")).

7.     In the midst of these troubles caused by the K-V Defendants' misconduct, the Company focused on the drug "17P" (ultimately re-branded by K-V as "Makena") as a way to turn the business around.  17P / Makena is a prescription hormone (progestin) medicine used for women who are pregnant and who have delivered a baby too early (preterm) in the past.  Doctors prescribe the drug to help women lower their risk of having future preterm babies.  The generic version of Makena is known as 17P, which was first approved in 1956 by the FDA.  17P was manufactured by Bristol–Meyers Squibb until production was stopped for commercial reasons in

2000.  Since 2000, the only purveyors were pharmacies that custom make drugs in small quantities, known as compounding pharmacies.  Compounding pharmacies charged $10 to $20 per injection, amounting to $200 to $400 for the drug's prescribed 20-week course.  In 2003, demand for 17P skyrocketed after a landmark study confirmed its effectiveness in preventing premature births.

8.    17P was decades old and was not protected by a patent.  However, the Orphan Drug Act ("ODA") provides seven years of exclusive sales rights to manufacturers who win FDA approval for drugs that affect fewer than 200,000 people.  The ODA is meant to encourage pharmaceutical companies to develop drugs for diseases that have a small market.  Consequently, under the ODA, K-V asked the FDA to rebrand 17P as "Makena" and give it orphan drug status.  K-V, after receiving that designation, conducted a clinical trial of Makena and was granted FDA approval to manufacture and sell it on February 4, 2011.  K-V thus apparently gained the exclusive right to market Makena, but it was unknown to the investing public whether compounding pharmacies would be allowed to continue making and selling 17P, Makena's generic counterpart.  Having obtaining purported exclusivity, the Company increased the price of Makena by 1490%, to a "list price" of $1500 per injection.  Rather than costing $200-$400 for a course of treatment, the new price soared to $15,000 to $30,000.

9.    On February 14, 2011, the K-V Defendants caused the Company to misrepresent to investors that K-V, through a program it called the "Makena Care Connection," would expand access to Makena to pregnant women who it claimed otherwise would not have been able to obtain the drug from compounding pharmacists.  In particular, the K-V Defendants caused K-V to state that it would ensure "access for every eligible patient."  In fact, however, the financial assistance policy set up by K-V Defendants for Makena Care Connection was woefully

7

insufficient to ensure universal access to all eligible patients (or anything near universal access), particularly in light of the large price increase that the K-V Defendants put forth.  This fact was concealed from the investing public—which was misled by the K-V Defendants' false statements—until March 17, 2011, when two United States Senators, Amy Klobuchar and Sherrod Brown, issued a press release and letter to the Federal Trade Commission ("FTC").  This press release discussed K-V's purported attempt to provide financial assistance for Makena patients such that, supposedly, "access for every eligible patient" would be ensured.  The Senators stated, contrary to the K-V Defendants' misrepresentations, that "***the financial assistance is not sufficient and does not extend to certain groups of women***," such that, in reality, "***KV Pharmaceutical's actions will result in diminished access to appropriate health care for women and result in increased preterm births***."

10.    As a result of the disclosure by the Senators that K-V's actions, in fact, would reduce access to Makena and not ensure its availability to all eligible patients (in direct contradiction to the K-V Defendants' earlier misrepresentations), the Company's Class A stock dropped 11.8% in a single trading session, from $9.64 to $8.50, on March 18, 2011.  Likewise, K-V's Class B shares also dropped 11.8% on that day, from $9.73 to $8.58.

11.    Crucially, the K-V Defendants caused the Company to further mislead the investing public by lying about the FDA's regulation of K-V's competitors, falsely stating that the FDA had no choice but to prohibit compounding pharmacists from making and selling generic Makena in competition with K-V.  For instance, on February 17, 2011, K-V stated that the FDA's enforcement discretion "***does not extend to compounding of copies or essentially copies of commercially available FDA-approved products" such as Makena***.  Similarly, defendant Goedeke publicly stated on February 14, 2011, that "***the regulations and laws are***

8

*very clear.  I think it's fair to say that compounding pharmacies are not FDA-approved manufacturing facilities and that FDA regulations and state pharmacy laws generally prohibit the distribution of compounded products that are the same or essentially the same as FDA-approved products.  We also believe that compounded pharmacies are aware of these laws and regulations, and our expectation is that they will adhere to them*."  As a result of this and other materially false and misleading statements, K-V's stock price jumped dramatically.

12.     Defendant A. Hermelin -- the uncle of Director Defendant D. Hermelin -- took advantage of the artificial inflation in K-V's stock by illegally selling more than $1 million worth of his personally held stock on March 4, 2011 at lofty prices in excess of $10 per share, on the basis of material non-public information regarding the Company and its actual outlook and financial position that he received from his nephew D. Hermelin.

13.     On March 30, 2011, the FDA issued a statement refuting the Company's representations and making it clear that they were false, and that in truth the Company had no protection from competition with Makena's generic counterpart 17P and that the FDA would not take any enforcement action against compounding facilities prescribing 17P.   The FDA's statement said in relevant part:

> [The] FDA understands that the manufacturer of Makena, KV Pharmaceuticals, has sent letters to pharmacists indicating that FDA will no longer exercise enforcement discretion with regard to compounded version of Makena.  ***This is not correct.***
>
> In order to support access to this important drug, at this time and under this unique situation, [the] FDA does not intend to take enforcement action against pharmacies that compound hydroxyprogesterone caproate [Makena].

14.     As a result of the FDA's statement contradicting the Company's prior false and misleading public statements (and confirming that the Company would not be able to charge the high prices for Makena that it had represented to the investing public that it would be able to

charge), the price of K-V's Class A stock dropped 20.5%, from $7.11 to $5.65, on March 30, 2011, on extremely high trading volume, with more than 25 million shares changing hands that day.  Similarly, K-V's Class B shares fell 20.4% that day, from $7.16 to $5.70 per share, on heavy trading volume.

15.     On April 1, 2011, the Company announced that it was reducing Makena's list price by nearly 55% to $690 per injection versus the previous list price of $1500.  As a result, K-V's revenue and earnings faced further erosion, and these revelations caused the price of K-V's Class A shares to fall an additional 10.0%, on April 1, 2011, from $5.99 to $5.39, on heavy trading volume.  Similarly, K-V's Class B shares dropped 9.6%, from $5.94 to $5.37. These decreases in the price of K-V's stock was a result of more of the artificial inflation caused by the K-V Defendants' false and misleading statements coming out of the price of the Company's stock.  Notably, the K-V Defendants admitted in the Form 10-Q filed with the SEC on February 9, 2012, that the Company's $28.8 million increase, from March 31, 2010, in its accounts receivable and accrued liability reserves "was primarily the result of increased price protection reserve associated with the price reduction of Makena [in that t]he list price was decreased from $1,500 per injection to $690 per injection subsequent to March 31, 2011."

16.     The final shoe dropped on April 4, 2011, when *Bloomberg* published a story entitled "KV Pharma's reduced Makena Price Won't Sway Some Physicians," which cited detailed interviews with several physicians, and disclosed that even with the 55% Makena list price reduction, prescribing physicians would not prescribe Makena to their patients.  As a result, K-V's stock price fell an additional 10% in a single trading session, closing down at $5.39 on April 4, 2011 from its close of $5.99 the prior evening.  As the market further absorbed the news regarding the true facts with respect to Makena, the Company's stock price suffered further

erosion and now trades at well below $2 per share.  (As a result of artificial inflation caused by the Company's materially false and misleading statements, the Company's Class A shares peaked during the Relevant Period at a price of $13.07 per share on March 8, 2011, and the Company's Class B shares peaked on that day at $13.08 per share.  As of the close of trading on November 7, 2011, K-V's Class A shares closed at a low of $0.89 per share, and K-V's Class B shares closed at a low of $1.27 per share.  On February 10, 2012, the last trading day prior to the day this Amended Complaint was filed, K-V's Class A shares closed at $1.62 per share, and K-V's Class B shares closed at $1.63 per share.)  The decline in the Company's stock price was a direct result of the artificial inflation caused by the K-V Defendants' materially false and misleading statements coming out of the price of the Company's stock.

17.    The Individual Defendants, due to their positions as officers, directors and fiduciaries of the Company, had access to non-public material information regarding the Company's sales projections, patient demand, and market conditions, including particularly the actual facts as to Makena and the competition the Company faced from compounding pharmacies that, contrary to the K-V Defendants' misrepresentations, could and would sell its generic counterpart, 17P.  However, the K-V Defendants, by their conscious and persistent failure to maintain internal controls and to oversee and properly manage the Company, caused and allowed K-V to conceal harsh truths from the investing public during the Relevant Period, and caused and allowed the Company to issue materially false and misleading statements regarding the Company's business and financial condition.  As the Individual Defendants must have known, the Company lacked a sufficient basis for the positive statements and optimistic outlooks the K-V Defendants disseminated to shareholders and the investing public at large.  The undisclosed information included the following material facts:

11

(a)     The Company had falsely stated that the FDA had granted K-V the exclusive distribution rights of Makena;

(b)     The FDA was <u>not</u> required to prohibit compounding pharmacists from manufacturing and selling generic Makena, 17P, in competition with K-V, and thus would not enforce the Company's purported exclusivity rights; and

(c)     Makena's $1500 price per injection and the Company's marketing of Makena would restrict, rather than increase, access to many groups, and that "access for every eligible patient" was never going to occur.

18.     As a result of the K-V Defendant's materially false and misleading statements as detailed herein, K-V's reputation has been damaged beyond repair.  Highly acclaimed physicians said that they would not recommend Makena because of the Company's attempted price gauging. In addition, as the market learned of Makena's true business prospects, K-V's market capitalization plummeted by approximately $300 million.  The Company's top management (*i.e.*, the Executive Defendants) and the hopelessly conflicted members of the Board are responsible for causing substantial damage to K-V.

19.     Moreover, on November 10, 2011, K-V revealed the latest failure of management and the Board stemming from their running the Company while knowing it lacked internal controls.  The Company shocked the investing public by announcing that it would have to **restate nine months' worth of financial statements because the K-V Defendants materially misstated the Company's liabilities**.  Consequently, the Company could **not** file its quarterly statement for the period ending September 30, 2011 in a timely fashion.  As a result of this news, further detailed below, the Company's market capitalization fell an additional 10%.

20.     Because of their knowing failure to implement and maintain internal controls and to oversee and properly manage the Company, the K-V Defendants substantially harmed the Company by, *inter alia*, causing and allowing it and the Executive Defendants to issue materially false and misleading statements. Indeed, due to the K-V Defendants' wrongful acts and omissions, the Company is now exposed to many millions of dollars in defense costs and likely liability as a result of federal securities fraud class action litigation filed against K-V.  As a result, Plaintiffs seek, among other things, to recover damages suffered, and to be suffered, by the Company as a result of the wrongful acts of the Individual Defendants as described herein.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiffs are citizens of Texas, and no Defendants are a citizen of that state.

22.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would otherwise not have.

23.     Venue is proper in this district because nominal defendant K-V maintains its principal executive offices in the District, and Defendants have conducted business and engaged in numerous wrongful activities which have had an effect on this District.

24.     Venue is proper in this district because a substantial portion of the transactions and wrongs alleged herein occurred in this District.

## PARTIES

25.     Plaintiffs Phil and Martha Thomas are current shareholders of K-V who purchased shares of K-V stock during the Relevant Period and continuously held K-V stock through the present.  Plaintiffs are residents and citizens of the state of Texas.

26.     Nominal defendant K-V is a corporation organized and existing under the laws of Delaware.  K-V has its principle executive offices located at One Corporate Woods Drive, Bridgeton, MO 63044. The Company is a specialty pharmaceutical company that develops, manufactures, acquires and markets branded and generic/non-branded prescription pharmaceutical products.  It operates in three segments:  brand products, specialty generics, and specialty raw materials.  K-V has conducted its branded pharmaceutical operations through its subsidiary Ther-Rx, and its generic, non-branded operations through its subsidiary K-V Generic Pharmaceuticals, Inc.

27.     Defendant Gregory J. Divis, Jr. ("Divis") is the Chief Executive Officer ("CEO") and President of the Company, and has been so throughout the Relevant Period.  Divis is named as a defendant in numerous federal securities fraud class actions complaints that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). K-V paid Divis the following compensation as an executive for the fiscal year 2011:  $313,070 in salary, $66,599 in option awards and $5,433 in other compensation which amounted to $385,102 in total compensation.  Divis is a citizen of the State of Missouri.

28.     Defendant Scott Goedeke ("Goedeke") is the Senior Vice President of Ther-RX Marketing and Market Access, and has been so at all relevant times.  Goedeke is named as a defendant in numerous federal securities fraud class actions complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Goedeke is a citizen of the State of Missouri.

29.     Defendant Robert E. Baldini ("Baldini") is and has been a director of K-V since July 29, 2010.  He serves on the Board's Compensation Committee, and the Board's Nominating and Corporate Governance Committee. K-V paid Baldini the following compensation as a

14

director for the fiscal year 2011:  $78,660 in cash and $20,674 in option awards, which amounted to $99,334 in total compensation.  Baldini is a citizen of the State of New York.

30.     Defendant Gregory S. Bentley ("Bentley") is and has been a director of K-V since June 10, 2010.  Bentley served as the Company's Senior Vice President, Law from June 10, 2010 until resigning from that position on August 1, 2011. K-V paid Bentley the following compensation as a director for the fiscal year 2011:  $53,607 in option awards, which amounted to $53,607 in total compensation.   Defendant Bentley is particularly beholden to those who control the Company, including particularly the Hermelins and Executive Defendants.   On June 10, 2010, Bentley accepted an offer to serve as the Company's Senior Vice President, Law during the Company's search for a new permanent General Counsel.  Pursuant to a letter dated October 26, 2010, in the event that Bentley ceases to serve as a director prior to December 31, 2013, other than by his resignation, by declining re-nomination or by re-election, he will continue to provide legal services to the Company for the 12-month period following his termination of service as a director at the minimum annual excessive and undeserved rate of $352,800.  Bentley is a citizen of the State of North Carolina.

31.     Defendant Mark A. Dow ("Dow") is and has been a director of K-V since June 10, 2010. He has been Chairman of the Board's Audit Committee (from June 2010 to approximately July 2011) and is a member of the Board's Compensation Committee. K-V paid Baldini the following compensation as a director for the fiscal year 2011:  $115,724 in cash and $20,167 in option awards, which amounted to $135,891 in total compensation.   Dow is a Certified Public Accountant and a citizen of the State of Missouri.

32.     Defendant David Hermelin (D. Hermelin) is and has been a director of K-V since 2004.   D. Hermelin is the grandson of the Company's founder, Victor M. Hermelin

("V. Hermelin") and the son of the Company's former CEO, M. Hermelin.  As of July 25, 2011, D. Hermelin beneficially owned 1,375,562 shares of K-V Class A Common Stock and 2,189,430 shares of K-V Class B Common Stock, representing 16.62% of the total voting power of K-V shareholders.  D. Heremlin furnished his uncle, Defendant A. Hermelin, with material non-public information belonging to the Company and A. Hermelin quickly traded on that basis, reaping more than $1 million in ill-gotten proceeds.  K-V paid D. Hermelin the following compensation as a director for the fiscal year 2011:  $425,639 in cash and $13,376 in option awards, which amounted to $439,015 in total compensation.  D. Hermelin is a citizen of the State of Missouri.

33.    Defendant Joseph D. Lehrer ("Lehrer") is and has been the so-called "lead independent director" of K-V since June 10, 2010, and he is also the Chair of the Board's Nominating and Corporate Governance Committee, and was a member of the Board's Audit Committee (from December 2010 to approximately July 2011). K-V paid Lehrer the following compensation as a director for the fiscal year 2011:  $360,681 in cash and $20,167 in option awards, which amounted to $380,848 in total compensation.  Lehrer is a citizen of the State of Missouri.

34.    Defendant David Sidransky, M.D. ("Sidransky") is and has been a director of K-V from June 24, 2010, and is the Chair of the Board's Compensation Committee and a member of the Board's Nominating and Corporate Governance Committee.  K-V paid Sidransky the following compensation as a director for the fiscal year 2011:  $101,384 in cash and $19,614 in option awards, which amount to $120,998 in total compensation.  Sidransky is a citizen of the State of Maryland.

35.    Defendant Ana I. Stancic ("Stancic") is and has been a director of K-V since June 17, 2010, and was a member of the Board's Audit Committee (from December 2010 to

16

approximately July 2011) and is a member of the Board's Compensation Committee.  K-V paid Stancic the following compensation as a director for the fiscal year 2011:  $106,527 in cash and $20,349 in option awards, which amounted to $126,876 in total compensation.  Stancic is a Certified Public Accountant and a citizen of the State of New York.

36.     Defendant Arnold L. Hermelin ("A. Hermelin") is the brother of M. Hermelin and the uncle of Defendant D. Hermelin.  As of July 25, 2011, A. Hermelin beneficially owned 289,179 shares K-V Class A Common Stock and 2,246,209 shares of K-V Class B Common Stock, representing 16.64% of the total voting power of K-V shareholders.  While in possession of material, non-public information with respect to the true condition of the Company, and on the basis of such information, A. Hermelin sold 100,000 shares of his stock on March 4, 2011 for $1,023,559.40 in illicit proceeds.

37.     The defendants identified in ¶¶ 27-28 are collectively referred to herein as the "Executive Defendants."  The defendants identified in ¶¶ 29-35 are collectively referred to herein as the "Director Defendants."  The defendants identified in ¶¶ 21, 33, and 35 are collectively referred to herein as the "Audit Committee Defendants".  The defendants identified in ¶¶ 29, 31, 34, and 35 are collectively referred to herein as the "Compensation Committee Defendants".  The defendants identified in ¶¶ 27-35 together are collectively referred to herein as the "K-V Defendants", and the defendants identified in ¶¶ 27-36 together are collectively referred to herein as the "Individual Defendants."

**FURTHER SUBSTANTIVE ALLEGATIONS**

38.     As directors, officers and fiduciaries of K-V, the Individual Defendants owed and owe to K-V specific fiduciary obligations.  These fiduciary duties include the duties to act loyally, to act in good faith and with due care, to speak with candor, and to not trade on the basis of inside information and to not tip inside information to others.  As directors of K-V, the

Director Defendants were obligated to, *inter alia*, install and maintain effective internal controls and reporting systems, make reasonable inquiry and exercise oversight and supervision of the Company and the Executive Defendants.  Because the Hermelin Family is the Company's *de facto* controlling shareholder, the members of the Hermelin Family, including defendant A. Hermelin, similarly owed and owe fiduciary duties to the Company.

39.   At all times during the Relevant Period, the Individual Defendants had access to, and were well aware of, non-public information regarding K-V's true financial condition and business prospects, including particularly with respect to Makena, the competition it actually faced with the generic version of that drug and the FDA's regulation of competitors, the pricing of and distribution program for Makena, and the likelihood of financial success for the Company and its actual liabilities and losses.

40.   The K-V Defendants were privy to and knew this information through their roles within the Company as officers and members of the Board, and acquired such non-public information through internal corporate documents, conversations amongst the directors and officers themselves and with other corporate officers and employees, attendance at management meetings and meetings of the Board, and through reports and other information provided to them in connection with their roles as directors, officers and fiduciaries of K-V.   Defendant A. Hermelin was privy to and knew this information through his close blood relationship with his nephew, Director Defendant D. Hermelin, and other members of the Hermelin clan, who together effectively control the Company.   A. Hermelin acquired such non-public information through communications with Company insiders, including particularly D. Hermelin.

41.   During the Relevant Period, K-V and the Executive Defendants made materially false and misleading statements concerning K-V's business and financial prospects, including

particularly with respect to Makena, and the Director Defendants knowingly caused or permitted these materially false and misleading statements to be made.  Among other things, the Company and Executive Defendants lied to the investing public with respect to the FDA's regulation of K-V's competitors, falsely stating that the FDA had no choice but to prohibit compounding pharmacies from making and selling, in competition with K-V, the generic equivalent to the Company's most important drug, Makena, and knowingly underreported the Company's liabilities and losses in misstating the Company's financial position to shareholders and the investing public.

42.    The falsity of Company's and Executive Defendants' statements in regard to Makena was confirmed by the public announcement by the FDA on March 30, 2011, in which the FDA stated that these statements were "not correct" and that the FDA, in fact, would not take enforcement action against compounding pharmacies producing the generic version of Makena.

43.    Despite their possession of non-public materially adverse information relating to the Company and its key drug (Makena), the K-V Defendants consciously disregarded that adverse material facts were not disclosed to, and were being concealed from, the investing public.  The K-V Defendants breached their fiduciary duties by making materially false and misleading statements to, and concealing material facts from, the investing public, and the Director Defendants further breached their fiduciary duties by, *inter alia*, consciously failing to install and maintain internal controls designed to prevent such subterfuge, and by their conscious failure to exercise oversight and manage the Company, including their knowing failure to prevent the Company and Executive Defendants from violating the law by disseminating materially false and misleading information to investors.

44.    Because of the Individual Defendants' breaches of their fiduciary duties, the

Company has been sued in numerous class action litigations alleging violation of the federal securities fraud laws and rules, which necessitates the Company incurring wasteful defense and investigatory costs and a likelihood of liability and costly adverse judgments.  Thus far, at least three securities fraud class action arising from the K-V Defendants' wrongful course of conduct have been filed against the Company (and Defendants Divis and Goedeke); specifically, *Julianello v. K-V Pharmaceutical Company, et al.* (No. 4:11-cv-01816-AGF), *Mukku v. K-V Pharmaceutical Company, et al.* (No. 4:11-cv-01888-CEJ), and *Cheong v. K-V Pharmaceutical Company, et al.* (No. 4:11-cv-01905-RWS) were filed in the United States District Court for the Eastern District of Missouri on, respectively, October 19, October 31, and November 2, 2011.

### Unlawful Insider Stock Sales by Defendant A. Hermelin

45.     Defendant A. Hermelin enjoyed unlimited access to the Company's non-public information through his and his family's control of the Company, including his nephew D. Hermelin's position on the Board.  Due to the overwhelming domination of Company by the founding family (the Hermelins), A. Hermelin had inside information to K-V's true business health and prospects.  Notwithstanding his possession of this material non-public information and his status as a fiduciary of K-V, and his corresponding duty either to refrain from trading or to disclose the adverse material facts set forth herein, A. Hermelin sold over **$1 million** worth of his Class A stock on a single day near the absolute peak of the Company's stock price.  Notably, these sales, which were made on March 4, 2011, were A. Hermelin's only reported sales ever of his personally held K-V stock.  A. Hermelin's sales was based upon the material, adverse non-public information furnished to him from the other members of the Hermelin family, in particular most likely from D. Hermelin.  This information was a proprietary asset belonging to the Company which was misappropriated by D. Hermelin and A. Hermelin for A. Hermelin's

personal gain.   Further, D. Hermelin faces a substantial likelihood of liability for providing inside information to A. Hermelin, which he then traded on, as well as for making and allowing materially false and misleading statements and for failing to implement internal controls.

46.    At the time of these illegal March 4, 2011 stock sales, A. Hermelin was in possession of adverse material inside information with respect to K-V's lies to the investing public, including that:

(a)    The Company's statements claiming that compounding pharmacies were no longer permitted to compound 17P were false;

(b)    The Company's statements that its pricing of Makena would ensure "access for every eligible patient" were false;

(c)    The Company's liabilities and losses were misstated in its publicly reported financial statements and that the Company would have to restate its publicly reported financial statements; and that

(d)    The Company's stock price was artificially inflated at the time he unloaded 100,000 shares of his K-V stock.

47.    A. Hermelin knowingly took advantage of the stock price's artificial inflation by selling his personally held stock into the market at artificially inflated prices.   A. Hermelin's illegal stock sales are detailed below:

| Insider Last Name | Transaction Date | Shares (Class A) | Price | Proceeds |
|---|---|---|---|---|
| Hemelin, Arnold L. | 3/4/2011 | 1,600 | $10.08 | $16,128.00 |
| | 3/4/2011 | 300 | $10.09 | $3,027.00 |
| | 3/4/2011 | 5,400 | $10.10 | $54,540.00 |
| | 3/4/2011 | 1,000 | $10.11 | $10,110.00 |
| | 3/4/2011 | 6,700 | $10.12 | $67,804.00 |
| | 3/4/2011 | 5,000 | $10.15 | $50,750.00 |
| | 3/4/2011 | 4,680 | $10.16 | $47,548.80 |

| | 3/4/2011 | 320 | $10.18 | $3,257.60 |
|---|---|---|---|---|
| | 3/4/2011 | 5,000 | $10.19 | $50,950.00 |
| | 3/4/2011 | 14,100 | $10.20 | $143,820.00 |
| | 3/4/2011 | 400 | $10.21 | $4,084.00 |
| | 3/4/2011 | 3,900 | $10.22 | $39,858.00 |
| | 3/4/2011 | 6,600 | $10.23 | $67,518.00 |
| | 3/4/2011 | 5,000 | $10.25 | $51,250.00 |
| | 3/4/2011 | 16,200 | $10.30 | $166,860.00 |
| | 3/4/2011 | 10,000 | $10.32 | $103,200.00 |
| | 3/4/2011 | 3,800 | $10.33 | $39,254.00 |
| | 3/4/2011 | 5,000 | $10.35 | $51,750.00 |
| | 3/4/2011 | 5,000 | $10.37 | $51,850.00 |
| | | | | |
| **TOTAL** | | **100,000** | | **$1,023,559.40** |

### Materially False and Misleading Statements Issued During the Relevant Period

48.     On February 14, 2011, the Company held a public conference call with investors and securities analysts.   On that call, Defendants Divis and Goedeke touted the purported expansion of patient access to Makena, and emphasized supposed FDA regulation of compounding pharmacies that purportedly would stymie such pharmacies from competing with the Company with respect to Mekena.  Defendants Divis and Goedeke stated on the call, in part, as follows:

[**Goedeke**]: Our Company's commercial team has spent years preparing for this moment; and we, too, are ready to join the fight against pre-term births. Prior to FDA approval of Makena, mothers who could benefit from therapy faced significant barriers to accessing treatment due to the absence of a commercially available FDA-approved product. ***Our Company has carefully studied how to best remove these barriers and built our go-to-market strategy to ensure that we are in position to help fulfill the promise of Makena by facilitating access to this crucially important medication for every eligible patient.***

*             *             *

[**Divis**]: In fact, it's not unusual for a pre-term birth to cost several hundred thousands of dollars or more. FDA-approved Makena helps fulfill critical unmet needs for the high-risk population of women who have experienced a singleton spontaneous pre-term birth. As noted earlier, prior to FDA approval of Makena, women who could benefit from therapy that may reduce the risk of pre-term birth

22

face significant barriers to access due to the absence of a commercially available, FDA-approved product. Because of these barriers, many eligible moms have been on the sidelines.

*As we have outlined, our Company recognizes the importance of addressing these barriers and is committed to helping fulfill the promise of Makena by ensuring access for every eligible patient.* Makena has been designated orphan drug status by FDA; and, as an orphan drug, the Makena-eligible population of women is relatively small but very important. Makena is used for a relatively short and well-defined period during pregnancy to help give babies the time they need to develop in the womb.

*The list price of Makena will be $1500 per injection; injections are administered weekly starting between 16 and 20 weeks of gestation and continuing until 37 weeks of gestation or delivery, whichever comes first. We believe that, on average, patients will receive approximately 15 to 20 injections. Based on the eligible patient population, which has been estimated in the literature to be approximately 140,000 patients annually and given that preterm birth can be very costly to a health plan, we anticipate that commercial payers and state Medicaid programs will cover and reimburse Makena.* We do note that many of our payer partners have a distinguished history in working toward prevention of pre-term birth as part of their ongoing corporate social responsibility and quality improvement initiatives, and the cost of prematurity can be very high. Makena can help offset some of those costs.

Our Company understands that pre-term birth is a complex, multi-factorial issue, and we are committed to working in concert with stakeholders to help ensure that all eligible patients have access to this crucially important medication. *We anticipate that some patients may need financial assistance, and we have established a comprehensive patient assistance program to help facilitate access to Makena through the Makena Care Connection.*

*Exemplifying our commitment to patient access, our comprehensive financial assistance program covers both uninsured and insured patients based on income eligibility requirements.* Specifically, women with household incomes up to $100,000 will be eligible for financial assistance. And notably, this income level includes approximately 85% of US households.

In summary, Makena represents a significant advance for a very important group of women, moms with a singleton pregnancy who have a history of a singleton spontaneous pre-term birth. *For the first time, their healthcare providers have an FDA-approved treatment supported by a comprehensive access program to help revive hope for their next pregnancy.*

*     *     *

[Analyst Tim Chiang of CTR Capital]:  [C]ould you talk a little bit more about what the strategy is to get the off-label compounding pharmacies off the market? Is that something you have to do, or is that something the FDA will help you in doing?  How many patients, also, do you think you can target in 2011 with this expanded sales force?  Do you have an internal goal?  Is there anything you could share with us about that internal goal?

[**Divis**]:  Thanks for your question, Tim. I'll take the latter question briefly, and then I'll let one of our colleagues address the compounding question.   We certainly believe, in terms of how we are structuring our go-to-market strategy with our sales force and what not puts us in a position to reach out to a requisite number of healthcare professionals to surround the major majority of the business opportunities that exist. We have done a lot of research to understand who they are and where they are, and obviously we have been in many of these offices for the last 10-plus years as a company in women's healthcare.

***So we believe we have a good handle of the physician audience and the target audience and who are the treaters for the Makena-eligible patient population.*** We are not in a position right now to give guidance in terms of patients that we expect to have initiated and initiate therapy in the coming year. However, ***we have established a clear objective strategically that we believe that this product, Makena, this treatment, is so important that we need to do everything we can to ensure every eligible mom has access and an opportunity to be treated, should they decide with their healthcare professional to be treated.***

With regards to compounding, I will let Scott Goedeke make a few comments on that.

[**Goedeke**]:  Thanks, Greg. Hello, Tim, appreciate your question. Tim, we believe that ***the regulations and laws are very clear***. I think it's fair to say that ***compounding pharmacies are not FDA-approved manufacturing facilities and that FDA regulations and state pharmacy laws generally prohibit the distribution of compounded products that are the same or essentially the same as FDA-approved products.***

***We also believe that compounded pharmacies are aware of these laws and regulations, and our expectation is that they will adhere to them.*** I think it's also fair to say that, despite the availability of compounded product, there have been moms on the sidelines because of significant logistical and financial barriers to access that are typically associated with non-FDA-approved products.  ***And I'll just close by saying that everything we have designed around Makena is to remove these barriers*** and to make sure that we fulfill our corporate commitment, which is to ***make Makena accessible to all eligible patients***.

49.     The Executive Defendants' material misrepresentations on the February 14, 2011 public conference call caused the price of K-V's shares to soar.  On the same day, after the statements quoted above, K-V Class A stock closed at $6.53 per share, up more than 49% or $2.15 per share, from their close the previous trading day of $4.38 per share.  Likewise, K-V Class B shares closed at $6.40 per share, up nearly 45% or $1.98 per share, from their close the previous trading day of $4.42.

50.     On February 17, 2011, K-V sent a letter to compounding pharmacists that investors and financial analysts took note of.  This letter stated:

> It is our understanding that your pharmacy compounds human prescription drugs, including hydroxprogesterone caproate injection [Makena].  Now that Makena is commercially available as the first and only FDA-approved hydroxprogesterone caproate injection manufactured at a cGMP-facility, compounded, unapproved formulations of hydroxyprogesterone caproate injection should no longer be made by compounding pharmacies.  Indeed, as articulated by the FDA in numerous enforcement actions, FDA has stated that it views compounded drugs to be "new drugs" within the meaning of 21 U.S.C. § 321(p), and as such, they may not be introduced into interstate commerce without FDA approval.  Although FDA will exercise its enforcement discretion with respect to certain pharmacy compounding practices, *this discretion does not extend to compounding of copies or essentially copies of commercially available FDA-approved products.*  Therefore, although compounding of hydroxyprogesterone caproate injection may have, in the past, been subject to FDA enforcement discretion, continuing to compound this product after FDA-approval of Makena renders the compounded product subject to FDA enforcement for violating certain provision of the Federal Food, Drug and Cosmetic Act, as well as FDA guidance. [Footnotes omitted]

51.     The materially false and misleading statements in K-V's February 17, 2011 letter caused the Company's shares to continue to rise.  On February 18, 2011, K-V's Class A shares closed at $9.86 per share, up nearly 15% or $1.28 per share, from their close the previous day of $8.58 per share.  Likewise, K-V Class B shares closed at $9.87 per share, up more than 15%, from their close the previous day of $8.58 per share.

52.     The statements referenced in ¶¶ 48 and 50 above were materially false and

misleading when made because they misrepresented and failed to disclose adverse material facts (which the Individual Defendants were well aware of), including that:  (1) the Company had falsely represented that the FDA had effectively granted K-V exclusive distribution rights over hydroxyprogesterone caproate (Makena/17P); (2) the FDA was <u>not</u> required to prohibit compounding pharmacies from manufacturing and selling generic Makena, 17P, in competition with K-V, and thus would <u>not</u> enforce the Company's alleged exclusivity rights; (3) the hefty $1500 price tag per injection of Makena would restrict access to many eligible patients, in contradiction to the Company's statement that it would ensure "access for every eligible patient," and would reduce the availability of the drug to physicians and patients and substantially decrease demand; (4) the Company lacked internal controls including with respect to financial reporting and disclosure; and (5) due to the foregoing, the Company's statements with respect to Makena's price, distribution program, competition, and the likelihood of financial success for the Company were lacking in any reasonable basis when made.

### *The Truth Begins to Emerge*

53.     On March 17, 2011, United States Senators Amy Klobuchar and Sherrod Brown issued a press release regarding a letter they had sent to the FTC.  That release stated in part:

> U.S. Senators Amy Klobuchar (D-MN) and Sherrod Brown (D-OH) today sent Federal Trade Commission Chairman Jon Leibowitz a letter urging the agency to launch an investigation into potentially anti-competitive behavior after a drug treatment used for high-risk pregnancies dramatically increased in cost.  The drug, commonly known as Makena, is a weekly injection of progesterone meant to prevent pre-term labor in pregnant women and has been safely administered by U.S. pharmacists in the past at a cost between $10 and $20 per injection.  ***After the Missouri-based drug company K-V Pharmaceutical was granted orphan status for its version of the drug, the cost reportedly rose to $1500 per injection-150 times the original cost.***
>
> "This is a proven and affordable drug that has been around for over 50 years.  It's critical that we make sure this company isn't taking advantage of its orphan-drug determination to monopolize the market and engage in price gouging at the

26

expense of pregnant women," Klobuchar said.  "At at time when rising prices for prescription drugs are stretching the budgets of middle-class families, we must be vigilant in stopping practices that would limit access to vital medicines"

*"KV created an overnight monopoly for this lifesaving drug-and then proposed raising the price by 14,900 percent," Brown said. "Last week, I called on KV Pharmaceuticals to immediately reconsider their decision, but to this date the company continues to defend this astronomical price increase.  Price-gouging is never acceptable, particularly not when it undermines public health and fleeces taxpayers.  Families deserve an investigation."*

Last week, Brown sent a letter to KC Pharmaceutical urging the Company to reverse course on the price increase for Makena.  Brown called on the company to maintain access to the critical drug to stem an increase in premature births.

The drug first came to the market over 50 years ago and it has recently been used to help prevent early births in women who have a history of spontaneous pre-term deliveries.  The price increase not only threatens to restrict individual access to the drug, it also places a heavy burden on state Medicaid programs, which cover a majority of high-risk pregnancies in this country.

54.    The Senators' press release attached their actual letter to the FTC, also dated

March 17, 2011, which stated in relevant part:

I am writing to request that the Federal Trade Commission initiate a formal investigation into any potential anticompetitive conduct arising out of KV Pharmaceutical's actions regarding a dramatic 150-fold increase in price that the company has applied to a proven progesterone treatment.

17-hydroxyprogesterone caproate, sold by KV Pharmaceutical under the name Makena, is a weekly injection of a form of progesterone meant to prevent pre-term labor in high-risk pregnant women.  This drug, which first came to market over 50 years ago, has recently been used to help prevent early births to women who had a history of spontaneous preterm deliveries.   Prior to KV Pharmaceutical's actions, this product was mixed by compound pharmacies and administered safely for $10 to $20 per injection.  *Due to the product being given orphan drug status, KV Pharmaceutical has potentially created an anticompetitive market and has indicated they will dramatically increase the cost per injection to $1500.*

While I understand the Food and Drug Administration (FDA) is working to ensure that drugs marketed and sold in the United States are safe and effective, I am concerned that *KV Pharmaceutical is taking advantage of FDA's approval of Makena and orphan drug determination* to achieve rights as the sole source for this limited use of progesterone, leading to a monopolization of treatments to

address preterm labors.

I appreciate KV Pharmaceutical's attempt to provide financial assistance to help purchase Makena.  However, ***the financial assistance is not sufficient and does not extend to certain groups of women***.  In additional [sic] to significant costs to individuals, this price increase will place a heavy burden on state Medicaid programs, which cover a majority of high-risk pregnancies.  I am extremely concerned that ***KV Pharmaceutical's actions will result in diminished access to appropriate health care for women and result in increased preterm births.***

Thank you for attention to my request.

55.     Immediately following this disclosure, the price of K-V's series A stock dropped 11.8%, from $9.64 to $8.50, in a single trading session, March 18, 2011.  Likewise, K-V's Class B shares also dropped 11.8% on that day, from $9.73 to $8.58.  These declines resulted from some of the artificial inflation, caused by the K-V Defendants' materially false and misleading statements, coming out of the Company's stock price.  The Company's stock price remained artificially inflated because the whole truth had yet to be revealed to the investing public.

56.     On March 23, 2011 the March of Dimes sent a letter to defendant Divis that was published and disseminated to the market, and stated in relevant part:

Dear Mr. Divis:

Thank you for your letter of March 17th.  I am pleased to learn that you are 'listening carefully to stakeholder concerns about list price, patient access, and cost to payers'.  Thank you for considering additional steps to ensure that Makena is available to all eligible women, and for convening stakeholders from the March of Dimes, the American College of Obstetricians and Gynecologists, the American Academy of Pediatrics, and the Society for Maternal Fetal Medicine next week.

In advance of that meeting, I want to go on the record that March of Dimes expects Ther-Rx to come to the table with substantive commitments including:

1.   ***A significant reduction in the list price of Makena.***

2.   ***Adjustments to the patient assistance program to ensure adequate coverage of all patients, insured and underinsured.***

28

3. ***A method for reporting on a regular basis to stakeholders*** on the patient assistance program to ensure that it is meeting the needs in a timely and adequate way.

4. ***A justification or rationale for your pricing*** based on your investment in the product, savings to the health care system or other appropriate methodology which you are prepared to make public.

***Without these elements, I do not believe that Makena can succeed in the current marketplace environment, and as a result, at-risk women will be denied access to a safe and effective treatment to reduce preterm delivery.***  Therefore if you are unable to make a clear commitment to significantly address the above issues at the meeting, the March of Dimes will need to pursue alternative strategies for ensuring that this proven intervention to prevent preterm birth is made available to all medically eligible pregnant women, and we will step away from our longstanding and productive corporate relationship with Ther-RX.  Thank you for your consideration of this critical matter.

57.    On March 30, 2011, the Company issued a press release, entitled "Ther-Rx Corporation Commits to Take Action Regarding Makena Pricing," in order to trick the public into believing that there would be a financial assistance program, which would provide universal access to the drug.  The press release stated in part:

To remove financial barriers to access, Ther-Rx established and has activated a patient financial assistance program (PAP) that not only reduces the total out-of-pocket costs for qualified patients, but eliminates out-of-pocket costs entirely for patients whose financial need is greatest.  The level of assistance already exceeds many federal program guidelines for healthcare subsidies.  Based on the feedback the company has received, we are currently exploring additional ways to help provide affordable access for all patients who are prescribed Makena.   This includes the expansion of the existing patient assistance program.

58.    On the same day, March 30, 2011, the FDA issued an announcement to quash the K-V Defendants lies regarding the purported prohibition on compounding pharmacies producing the generic version of Makena, entitled "FDA Statement on Makena," that stated in part:

***FDA understands that the manufacturer of Makena, KV Pharmaceuticals, has sent letters to pharmacists indicating that FDA will no longer exercise enforcement discretion with regard to compounded versions of Makena.  <u>This is not correct</u>.***

29

In order to support access to this important drug, at this time and under this unique situation, *FDA does not intend to take enforcement action against pharmacies that compound hydroxyprogesterone caproate based on a valid prescription for an individually identified patient unless the compounded products are unsafe, of substandard quality, or are not being compounded in accordance with appropriate standards for compounding sterile products.*  As always, FDA may at any time revisit a decision to exercise enforcement discretion.

59.    Due to these revelations, K-V's Class A stock immediately dropped 20.5% on heavy trading volume, from $7.11 to $5.65, in a single trading session, March 30, 2011. Likewise, K-V's Class B shares fell 20.4%, from $7.16 to $5.70 per share, on heavy trading volume.  These decreases in the price of K-V's stock was a result of more of the artificial inflation caused by the K-V Defendants' materially false and misleading statements coming out of the price of the Company's stock.

60.    On April 1, 2011, the Company issued a press release that stated in part:

As part of its ongoing efforts to ensure that high-risk women have access to FDA-approved Makena instead of unapproved, unregulated compounded drugs, Ther-RX Corporation, a subsidiary of K-V Pharmaceutical Company (NYSE: KVa/KVb) (the "Company"), announced today important initiatives to reduce the cost of Makena™ (hydroxyprogesterone caproate injection) and encourage stakeholders to provide timely access to this important FDA-approved medication.  Effective immediately, TherRX has:

- *Reduced the list price of Makena by nearly 55 percent, to $690 per injection*;

- *Will offer supplemental rebates that, in conjunction with the list price reduction and the standard Medicaid rebate of 23.1 percent, will result in a substantially reduced cost per injection for state Medicaid agencies compared to list price.*  This will help ensure that every woman who is prescribed Makena-regardless of her ability to pay-has the comfort of knowing a medication that has been rigorously reviewed by FDA for safety and efficacy is available to her;

- *Capped the costs for a full course of therapy to a maximum of three vials (15 injections)* for contracted health insurance plans and state Medicaid agencies; and

30

- *Expanded the Company's patient assistance program for patients who are prescribed this important medication by removing income caps to qualify for financial assistance.  85 percent of patients will pay $20 or less per injection for FDA-approved Makena, and patients whose financial need is the greatest would receive FDA-approved Makena at no out-of-pocket cost.*

61.     These revelations caused the price of K-V's Class A shares to fall an additional 10.0%, on April 1, 2011, from $5.99 to $5.39, on heavy trading volume.  Likewise, K-V's Class B shares dropped 9.6%, from $5.94 to $5.37, on heavy trading volume.  These decreases in the price of K-V's stock was a result of more of the artificial inflation caused by Defendants' materially false and misleading statements coming out of the price of the Company's stock.

62.     On April 4, 2011, the final shoe fell when *Bloomberg* published a story entitled "KV Pharma's Reduced Makena Price Won't Sway Some Physicians," that revealed, citing detailed interviews with several physicians, even with the 55% Makena list price reduction, prescribing physicians would not recommend Makena to their patients.  Quoting George Saade, professor and division chief of maternal-fetal medicine at the University of Texas, *Bloomberg* reported that "'KV/A lowered the price but it is still too high;' capped to 15 doses a pregnancy Makena could cost up to $7000 after discounts to Medicaid and other items."  Arnold Cohen, professor and chairman of the department of OBGYN at Albert Einstein Medical Center in Philadelphia, told *Bloomberg* that the hostility generated by the initial Makena price had created a barrier to using K-V's Makena as there was already a cheaper alternative on the market that the FDA stood behind (i.e., 17P from compounding pharmacies), with Cohen emphasizing:  "If I have a choice, let's say this never happened and KV-A came out and said Makena is going to be priced at $50 for an injection, I think most of us would have been ok with that."  *Bloomberg* also reported that "[a]t current prices if a physician were to buy Makena, that physician would have to assume the responsibility for the inventory, as there is no guarantee a patient or an insurance

31

company will pay for it," citing Baha Sibai, professor of clinical obstetrics and gynecology at the University of Cincinnati.

63.     As a result of these April 4, 2011 revelations, K-V's Class A stock price dropped another 7.2% further in a single trading session, closing down at $5.00 on April 4, 2011 from their close the prior trading day of $5.39, on heavy trading volume.  Likewise, K-V's Class B shares dropped 6.3%, closing down at $5.03 from their previous close of $5.37. These decreases in the price of K-V's stock was a result of more of the artificial inflation caused by the K-V Defendants' materially false and misleading statements coming out of the price of the Company's stock.

64.     As the market further absorbed the news regarding the true facts with respect to Makena, the Company's stock price suffered further erosion and now trades well under $2 per share.  (As of the close of trading on February 10, 2012, K-V's Class A shares closed at $1.62 per share, and K-V's Class B shares closed at $1.63 per share.  As of the close of trading on November 7, 2011, K-V's Class A shares closed at a low of $0.89 per share, and K-V's Class B shares closed at a low of $1.27 per share.)  The decline in the Company's stock price was a direct result of the artificial inflation caused by the K-V Defendants' materially false and misleading statements coming out of the price of the Company's stock and their conscious failure to oversee and manage the Company and establish, implement and maintain internal controls.

65.     The dissemination of the materially false and misleading statements detailed above was the direct result of the Director Defendants' knowing abdication of their fiduciary duties to prevent the Executive Defendants from disseminating materially false and misleading information to the investing public, and to install and maintain internal controls designed to prevent such subterfuge and to exercise oversight and manage the Company so as to not violate

32

its obligations under the federal securities fraud laws.

66.     As a result of the Individual Defendants' breaches of their fiduciary duties, the Company is now forced to defend itself against class action litigation alleging violation of the federal securities fraud laws, which necessitates the Company incurring wasteful defense and investigatory costs and a substantial likelihood of liability and costly adverse judgments.  As noted above, at least three securities fraud class action arising from the K-V Defendants' wrongful course of conduct have been filed against the Company (and Executive Defendants Divis and Goedeke); specifically, *Julianello v. K-V Pharmaceutical Company, et al.* (No. 4:11-cv-01816-AGF), *Mukku v. K-V Pharmaceutical Company, et al.* (No. 4:11-cv-01888-CEJ), and *Cheong v. K-V Pharmaceutical Company, et al.* (No. 4:11-cv-01905-RWS) were filed in the United States District Court for the Eastern District of Missouri on, respectively, October 19, October 31, and November 2, 2011.

67.     Further, the Individual Defendants' wrongful course of conduct has subjected the Company to a significant risk of additional litigation against the Company, including by buyers and holders of senior secured notes that the K-V Defendants caused the Company to issue during the Relevant Period while the K-V's stock price was artificially inflated.  In particular, on March 1, 2011, K-V issued a press release announcing that the Company intended to offer $200 million of senior secured notes due 2015 in a private placement, pursuant to Regulation D under the Securities Act of 1933.  The Company completed the private placement with a group of institutional investors for $225 million aggregate principal amount of 12% Senior Secured Notes due 2015.  It was only due to the K-V Defendants' materially false and misleading statements and omissions of material facts, and the artificial inflation these caused to the K-V's stock price that the Company was able to sell these notes at the prices and on the terms it did.  It is likely

33

that buyers and holders of these notes will sue the Company with respect to the wrongdoing set forth herein and in the federal securities fraud class action litigation, thus further damaging the Company by causing it to incur further wasteful costs and other harm.

*False and Misleading Statements Concerning K-V's Underreported Liabilities and Losses*

68.    Moreover, on November 10, 2011, the Company shocked the market by announcing that it would not be able to file its quarterly report in a timely fashion because the K-V Defendants had been improperly underreporting the Company's liabilities.  K-V revealed that it had determined that its previously issued consolidated financial statements included in its original 2010 Form 10-K and its quarterly reports on Form 10-Q for the quarters ended December 31, 2010 and June 30, 2011 (all signed and certified by defendant Divis) "should not be relied upon," because the Company had not been properly accounting for warrants that it issued in November 2010 and March 2011, wrongly treating these warrants as equities instead of liabilities.  Due to this egregious misstatement, the Company had to restate its publicly reported financial statements for the fiscal year ended March 31, 2011 on Forms 10-K/A, and amended Quarterly Reports on Forms 10-Q/A for the quarters ended December 31, 2010 and June 30, 2011.

69.    As revealed on November 10, 2011, the K-V Defendants had been improperly underreporting the Company's liabilities for nine months.   The Company stated, in the Notification of Late Filing filed by the Company with the SEC on Form 12b-25 before the market opened on November 10, 2011, that "On November 7, 2011, the Company's Audit Committee of the Board of Directors, upon recommendation from K-V management, concluded that certain previously issued financial statements did not include the proper treatment and

classification for the embedded derivative feature of warrants issued in November 2010 and March 2011.  Specifically, the warrants were misclassified as equity instead of as liabilities. Therefore, the Company will restate and amend previous filings as a result of the misapplication of accounting guidance relating to non-standard anti-dilution provisions in the warrants.  In the restated financial statements, the warrants will be classified as liabilities beginning with the date they were first issued in November 2010 or March 2011, as applicable, with changes in the fair value being recorded as non-cash income or expense in each reporting period....  Consequently, the Company will file an amended Annual Report on Form 10-K/A for the fiscal year ended March 31, 2011 that will contain restated financial statements for the fiscal year ended March 31, 2011, and amended Quarterly Reports on Forms 10-Q/A for the quarters ended December 31, 2010 and June 30, 2011, respectively, that will contain restated financial statements for each affected quarter....  Until such amended filings are made, the original filings for those periods should not be relied upon."  Due to this revelation, the Company's stock price dropped approximately 10%, with its Class A shares closing down to $1.44 on November 10, 2011, from $1.59 the previous day, and its Class B shares closing down to $1.72 from $1.92.  In total, K-V's market capitalization plunged approximately $700 million, more than 88% from its high.

70.    Further, the Company continued to report losses and has no choice but to issue debt in an attempt to remain viable (within the short time span of a year, K-V accumulated liabilities of over $300 million with a cash to debt ratio of $121.6 to $450.8 million).  K-V's liabilities were (and are) of obviously great importance to the Company's shareholders, as the K-V Defendants were undoubtedly well aware.  The restatement of the Company's financial results revealed that the Company's losses were far greater than had previously been reported, as detailed below (at ¶ 72).  The K-V Defendants were also no doubt well aware that the

Company's losses were of obviously great importance to the Company's shareholders.

71.     In the Company's restated financial statements on Form 10-Q/A for the quarter

ended June 30, 2011, filed with the SEC on December 12, 2011, the K-V Defendants stated:

> *Upon a re-examination of the provisions of the Warrants, the Company determined that the non-standard anti-dilution provisions contained in the Initial Warrants and the as amended Warrants require that* **(a) the Warrants be treated as liabilities from their respective issuance dates and (b) their value should be calculated utilizing a valuation model which considers the mandatory conversion features of the Warrants and the possibility that  Company issues additional common shares or common share equivalents that, in turn, could result in a change to the number of shares issuable upon exercise of the Warrants and the related exercise price.** *Accordingly, the Company has restated its consolidated financial statements for the fiscal year ended March 31, 2011, and for the quarters ended December 31, 2010 and June 30, 2011.* **The Company also classified the Warrants as a long-term liability.**

72.     In the Company's fiscal year 2011 restated financial statement on its Form

10-K/A filed with the SEC on December 8, 2011, the K-V Defendants revealed that among the

negative implications of the restatement was that the Company's net loss for the fiscal year

ended March 31, 2011, **was actually a loss of $271.7 million, as opposed to the $174 million it**

**had previously reported**, a major discrepancy of material importance to shareholders.   The

10-K/A contained the following table with respect to the negative impact of the restatement:

| | Year Ended March 31, 2011 | |
| --- | --- | --- |
| | As Previously Reported | As Restated |
| Statement of Operations data: | | |
| Loss on extinguishment of debt | $ 106.2 | $ 112.7 |
| Change in warrant liability | (70.7) | 20.2 |
| Interest expense | 15.4 | 15.7 |
| Total other expense, net | 48.9 | 146.6 |
| Loss from continuing operations before income taxes | (148.4) | (246.1) |
| Loss from continuing operations | (156.2) | (253.9) |
| Net loss | (174.0) | (271.7) |
| Basic and diluted loss from continuing operations per share | (3.05) | (4.95) |
| Basic and diluted net loss per share | (3.40) | (5.30) |
| Total comprehensive loss | (173.9) | (271.6) |
| Statement of Shareholders' Equity (Deficit) data: | | |
| Net loss | $ (174.0) | $ (271.7) |
| Issuance of warrants | 81.6 | 0 |

36

| | | |
|---|---:|---:|
| Reclassification of warrants as liabilities | (175.5) | 0 |
| Statement of Cash Flows data: | | |
| Net loss | $ (174.0) | $ (271.7) |
| Change in warrant liability | (70.7) | 20.2 |
| Loss on extinguishment of debt | 106.2 | 112.7 |
| Other | 0 | 0.3 |

73.     In addition, in the Company's amended quarterly report filed with the SEC on December 8, 2011 on Form 10-Q/A, the Company reported that its total liabilities for the quarters ending March 31, 2011 and June 30, 2011, were actually $942.5 million and $829.9 million, respectively, as opposed to the $938.7 million and $825.5 million previously reported.

74.     Further, the K-V Defendants and the Company admitted to "material weaknesses in our internal controls over financial reporting" in its fiscal year 2011 Form 10-K/A.   The 10-K/A stated, in part:

> **We have material weaknesses in our internal control over financial reporting and cannot assure you that additional material weaknesses will not be identified in the future.**  If we fail to maintain an effective system of internal controls or discover material weaknesses in our internal control over financial reporting, we may not be able to report our financial results accurately or timely or detect fraud, which could have a material adverse effect on our business.

*      *      *

> **There is substantial doubt about the Company's ability to continue as a going concern.**

75.     Moreover, as admitted by the K-V Defendants in the Company's quarterly report filed on Form 10-Q with the SEC on February 9, 2012, "As of December 31, 2011, these **material weaknesses** [in the Company's internal controls over financial reporting, identified in 2011 Form 10-K/A] **have not been remediated**.  As admitted by the K-V Defendants in the Form 10-Q filed on February 9, 2012:

***Material weakness in entity-level controls.***[4]   We did not maintain an effective control environment or entity-level controls with respect to risk assessment, information and communications and monitoring components of internal control. **We did not**:

    a.    **design adequate controls to identify and address risks critical to financial reporting, including monitoring controls and controls to ensure remediation of identified deficiencies**.

**Such deficiencies resulted in a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis** and contributed to the other material weaknesses described below.

***Material weakness surrounding financial statement preparation and review procedures and application of accounting principles.***[5]   Our policies and procedures did not adequately address the financial reporting risks associated with the preparation and review of our financial statements.  **We did not**:

    a.    design controls over access, changes to and review of our spreadsheets used in the preparation of financial statements;

    b.    design controls necessary to ensure that information for new and modified agreements was identified and communicated to those responsible for evaluating the accounting implications; and

    c.    **develop policies and procedures necessary to adequately address the financial reporting risks associated with the application of certain accounting principles and standards**.

**Such deficiencies resulted in a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.**

76.    As detailed above, the K-V Defendants' improprieties resulted in the Company disseminating materially false and misleading public statements with respect to the Company's liabilities as well as its key drug, Makena.  These false and misleading statements have ruined K-V's credibility and reputation, as evidenced by the Company's nearly $700 million, or approximately 88%, market capitalization loss. In addition, the Individual Defendants' wrongful course of conduct has subjected the Company to further wasteful costs and risks, including a

---

[4] This sentence emphasized in the original.
[5] This sentence emphasized in the original.

likelihood of fines and penalties by the SEC and other regulators.  Moreover, these and other wrongful actions detailed above have damaged K-V's corporate image and goodwill beyond repair, as evidenced by, among other things, well-respected physicians' refusal to prescribe Makena.

77.     Moreover, as the direct result of the K-V Defendants' misconduct, K-V has wastefully expended, and will continue to waste, substantial sums of money.  Such expenditures include, but are not limited to:

(a)     Costs incurred from defending and paying any settlements and/or judgments in class and individual actions for violations of federal securities laws;

(b)     Profits lost from sales of Makena as a result of negative public and physician sentiment about the Company;

(c)     Costs incurred from restating the Company's financial statements; and

(d)     Costs incurred from compensation and benefits paid to the Individual Defendants while in the course of breaching their fiduciary duties to K-V.

78.     Accordingly, K-V has been and will continue to be substantially damaged.

**DERIVATIVE ALLEGATIONS AND THE FUTILITY OF DEMAND**

**Derivative Allegations**

79.     Plaintiffs bring this action derivatively on behalf of and for the benefit of K-V to redress injuries suffered, and to be suffered, by it as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties alleged herein.  The Company is a nominal defendant named solely in a derivative capacity.

80.     Plaintiffs purchased and held shares of K-V during the Relevant Period and continue to hold such shares today.  Thus, Plaintiffs were K-V shareholders during wrongdoing

complained of herein.

81.    Plaintiffs will fairly and adequately represent the interests of the Company, and have retained competent counsel experienced in derivative litigation to enforce and prosecute this action.

82.    The wrongful acts complained of herein subject and will persist in subjecting K-V to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

**The Futility of Demand**

83.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.    At the time of the filing of this action, K-V's Board of Directors is composed of seven directors, namely, the Director Defendants:  Baldini, Bentley, Dow, D. Hermelin, Lehrer, Sidransky and Stancic.  Plaintiffs did not make a demand on the Board prior to instituting this action because doing so would be a futile and useless act for at least the following reasons.

85.    Each of these directors has been named as a defendant in this action and was a director during the time period when K-V is alleged to have issued materially false and misleading statements.

86.    The Director Defendants owed a duty to K-V and its shareholders to be reasonably informed about the business and operations of the Company, and to responsibly oversee the Company and ensure that meaningful internal controls were in place.  The Director Defendants completely abdicated their oversight duties to the Company in allowing and enabling the improper conduct, including by consciously failing to implement and maintain internal procedures and controls necessary to prevent the wrongdoing alleged herein.   The Director

Defendants face a substantial likelihood of liability for the breaches of fiduciary duty as set forth herein.

87.     Further, each of the Director Defendants had a duty to adhere to K-V's Standards of Business Ethics Policy (the "Ethics Policy").  The Ethics Policy, expressly governing "every director," required the K-V Defendants "to maintain the highest standards of business ethics and conduct" and to be "fully compliant with all applicable laws, rules, and regulations, and to behave at all times with honesty, respect, and propriety."  The Director Defendants breached their duties under the Ethics Policy in the course of the wrongdoing set forth herein, thus further exposing the Director Defendants to a substantial likelihood of liability.  Therefore, demand upon the Board is futile.  Further, through their acts and omissions, the Board egregiously violated their fiduciary duties owed to K-V and to K-V's shareholders, and these egregious acts are incapable of ratification, and subject the Director Defendants to a substantial likelihood of liability.

88.     Plaintiffs did not make a demand on the Company's Board prior to instituting this action because the wrongful acts complained of herein evidence a pattern of conduct showing a wholesale abandonment of the Director Defendants' fiduciary duties, including their duties to behave loyally and with good faith, exercise oversight, due care and diligence, and to speak with candor.  These acts, which demonstrate an egregious pattern of misconduct, were not, nor could they have been, the product of a valid or good faith exercise of business judgment.

89.     Demand is excused because the Board has exhibited antipathy towards investigating or prosecuting corporate wrongdoing.  To date, the Board has failed to take any action in this regard with respect to the wrongdoing set forth herein.  Despite the Director Defendants having knowledge of the facts underpinning the claims and causes of action raised by

41

Plaintiffs, the current Board has failed and refused to seek to recover damages or other relief for K-V in connection with any of the wrongdoing alleged by Plaintiffs.

90.     Demand on the Board would be futile because Defendants Baldini, Bentley, Dow, Hermelin, Lehrer, Sidransky, and Stancic lack independence and are beholden to those who control K-V, *i.e.*, the Hermelins and Executive Defendants.

*The Hermelin Family's Overwhelming Domination and Control of the Board Renders Demand Futile*

91.     Director Defendant D. Hermelin is a member of the Company's founding family, the Hermelins, which controls K-V.  The Hermelin family controls 62.3% percent of the total voting power of KV shareholders and 25.7% percent economic interest in the Company. D. Hermelin is the grandson of the Company's founder V. Hermelin, and the son of M. Hermelin, the Company's former Vice Chairman and CEO, and son of Sarah R. Weltscheff, Vice President, Administration and Corporate Communications.   Moreover, A. Hermelin, the founders' other son and another member of the Hermelin family clan controlling the Company, sold 98,400 shares of K-V Class A stock during the Relevant Period on the basis of material non-public information misappropriated from the Company, while the Company's stock price was artificially inflated (specifically, on March 4, 2011, at an average price of $10.24 per share), through which he wrongfully reaped $1,023,000.

92.     D. Hermelin has used his family name and his family domination and control over the Company as a way in which to appoint himself to various positions within the Company. For example, D. Hermelin has held many positions at the Company in addition to his seat on the Board (held since 2004); he was the Company's Vice President of Corporate Strategy and Operations Analysis from 2002-2008, Vice President of Corporate Planning Administration from 1995 to 2002, and Manager of Strategic Planning and Administration from 1990-1993.

D. Hermelin is beholden to his family's ownership interest in the Company, which has been a family-run business since its founding in 1942, and it is clear that D. Hermelin is not independent and that he would not be disinterested in responding to a demand to sue his uncle, A. Hermelin, and the Executive Defendants and his fellow wrongdoers on the Board.

93.     Further confirming D. Hermelin's lack of independence, and that the other Director Defendants are beholden to D. Hermelin and his family clan and the Company executives serving them, is the grossly excessive total compensation package of $439,015 (of which $425,639 was in cash) that D. Hermelin was given by the Board for the Company's fiscal year 2011 (ended March 31, 2011) even though he no longer serves as an executive at K-V. D. Hermelin will likely receive as much, if not more, from the Company for fiscal year 2012. Such amounts of pay are material to D. Hermelin, and his unjust pay package results from his blood relationship to his family members who, together with him and the Executive Defendants and Director Defendants serving them, control of the Company.

94.     Further indicative of the Board's lack of internal controls is the criminal misconduct engaged in by D. Hermelin's father, M. Hermelin, and the Company, which as discussed above (¶ 6) resulted in M. Hermelin's imprisonment, Ethex's felony conviction, as well as the related wrongdoing which led to K-V and its subsidiaries' entry into a consent decree with the FDA for making and distributing adulterated and unapproved drugs.

95.     Additionally demonstrating D. Hermelin's lack of independence is the fact that he and his father, M. Hermelin, are partners in a partnership that leases certain real property to the Company.  The Company made lease payments to the Hermelins and their partners for this property in the amount of $322,548 during the Company's fiscal year ended March 31, 2011.

96.     Another illustration of the Hermelin family's domination and control of both the

Board and the Company is seen on May 7, 2010 when the Company filed a Schedule 14A Proxy Statement with the SEC with eight nominees for the Board: Jean Bellin ("Bellin"), Kevin S. Carlie ("Carlie"), Terry B. Hatfield ("Hatfield"), D. Hermelin, M. Hermelin, Jonathan E. Killmer ("Killmer"), John Sampson ("Sampson"), and Norman D. Schellenger ("Schellenger").  Further, on June 10, 2010, at the annual shareholder meeting, Bellin, Carlie, Kilmer, and Schellenger were not elected to the Board.  Rather, defendants Dow, Lehrer, and Bentley (previously not announced nominees) were elected to the Board along with D. Hermelin, M. Hermelin, Hatfield, and Sampson.  It is clear that the Hermelin family hand-picked Dow, Lehrer, and Bentley and quashed the nomination of Bellin, Carlie, Kilmer, and Schellenger.  Indeed, the Hermelins' control over the selection of directors is further evident from the Company's admission that "at the Annual Meeting of Stockholders held on June 10, 2010, [M.] Hermelin caused the re-election of himself to the board."  Dow, Lehrer, and Bentley and beholden to the Hermelins and plainly neither disinterested nor independent.

97.    Additionally on June 15, 2010, Hatfield and Sampson quickly resigned from the Board, citing "serious concerns regarding the ability of the newly-constituted Board and senior management to provide the required independent oversight of the business during the current critical period in its history."  Once Hatfield and Sampson resigned, the remaining Board members all shared a crucial commonality -- they were all hand-picked by the Hermelin clan to serve on the Board.  Between June 17, 2010, and July 29, 2010, the Hermelins effectively appointed Stancic, Sidransky, and Baldini as directors.

98.    On November 10, 2010, M. Hermelin resigned from the Board due to the ETHEX scandal.  M. Hermelin's resignation from the Board did not stop his family's domination and control over the Company and the Board.  The Hermelin family still controls the Company,

44

including through D. Hermelin's seat on the Board and their control of K-V's voting stock (including through family trusts).

99.    Indeed, the Company has effectively admitted that the Board is dominated by M. Hermelin.  This admission was made in a complaint that the Company filed in an action that it was forced to bring against M. Hermelin (seeking a judicial determination that M. Hermelin was terminated rather than that he resigned).   In its complaint in that action,[6] the Company entitled an entire section, **"Hermelin's Control Over K-V and its Board of Directors"**, which illustrates specifics of the Hermelin family's control over the Company and the Board.   In particular, as detailed therein, as of January 2010, the Hermelin family held 70.2% of K-V's Class B stock and 11.4% of its Class A stock.  The Class B stock is entitled to one vote, whereas the Class A stock is entitled to only 1/20th of a vote.   K-V had, as of January 2010, issued approximately 12.1 million shares of Class B stock and approximately 37.7 million shares of Class A stock.  The Class B shares were entitled to approximately 12.1 million votes, and the Class A stock entitled to approximately 1.9 million votes.    Thus, the Hermelins had approximately 62.3% of the total voting power of K-V shareholders and held approximately 25.7% of the economic interest in the Company (with the remaining 74.3% economic interest held by public shareholders).  The Hermelins still maintain their control over the Company and this approximate level ownership and voting power (A. Hermelin's illicit sale of 100,000 shares of his Class A stock did not materially affect his family's voting power).

100.    In the foregoing action, the Company had no choice but to sue M. Hermelin as a result of his demands for advancement and indemnification of attorney fees and fines (including his payment of $1.9 million to the U.S. government) and claims that he was entitled to severance

---

[6] That action is *K-V Pharmaceutical Company v. Marc Hermelin*, Case No. 11SL-CC04054, in the Circuit Court of St. Louis County.

and retirement worth nearly 37 million dollars.  **K-V revealed in its 10-Q filed on August 9, 2011, that "there is substantial doubt about the Company's ability to continue as a growing concern,"** particularly due to its liquidity issues.  Unfortunately, the Board had no choice but to bring suit against M. Hermelin given M. Hermelin's high dollar demands together with the Company's poor financial condition and liquidity issues.[7]  Since the Board is overwhelmingly

---

[7] The Company was effectively forced to sue M. Hermelin for his demands with respect to advancement and indemnification of attorney fees and fines (including his payment of $1.9 million to the U.S. government), including that he was entitled to severance and retirement worth nearly $37 million. In its Form 10-Q filed on August 9, 2011, K-V admitted that "there is a substantial doubt about the Company's ability to continue as a going concern," including due to its liquidity issues.  In light of M. Hermelin's large demands, together with K-V's weak financial position and liquidity issues caused by the K-V Defendants' breaches of fiduciary, the Company had no choice but to sue him.  Indeed, K-V admitted in the Form 10-Q the Company filed with the SEC on February 9, 2012, that "If it is determined that Mr. M. Hermelin did effectively retire prior to December 5, 2008, the actuarially determined present value (as calculated in December 2008) of the retirement benefits due to him would total $36.9 [million]" -- money the Company could ill-afford to lay out.  As the Company further admitted therein, "Any determination with respect to these legal proceedings adverse to the Company could have a material adverse effect on our business, financial condition and results of operations, including creating events of default under our secured and unsecured debt obligations.  In addition, if required to be paid, certain of the indemnification obligations may not be 'covered matters' under our directors' and officers' liability insurance, or there may be insufficient coverage available....  Due to these insurance coverage limitations, we may incur significant unreimbursed costs to satisfy our indemnification and other obligations, which may have a material adverse result on our financial condition, results of operations and cash flows."  In the instant case, however, the Board does not face the same overwhelming pressure to sue D. Hermelin or A. Hermelin, and thus will refrain based upon the Hermelin clan's overwhelming control and domination of the Board.

(On October 14, 2011, M. Hermelin filed an action in the Court of Chancery in the State of Delaware styled *Marc S. Hermelin v. K-V Pharmaceutical Company*, for advancement of attorneys' fees that he has incurred and will incur in the St. Louis County and Delaware actions, seeking advancement of expenses in connection with certain proceedings, and mandatory and permissive indemnification of attorneys' fees and other expenses incurred as to other proceedings.  M. Hermelin claims that he is entitled to such amounts under the Company's Bylaws, Delaware law and his indemnification agreement.  On February 7, 2012 the Court of Chancery issued a Memorandum Opinion determining:  (1) M. Hermelin is entitled to mandatory indemnification in the FDA consent decree matter; (2) M. Hermelin is not entitled to mandatory indemnification with respect to his payment of $1.9 fine and forfeiture resulting from his guilty plea; (3) M. Hermelin is not entitled to mandatory indemnification in the HHS OIG exclusion matter; (4) M. Hermelin is not entitled to advancement from the Company in connection with a

dominated and controlled by the Hermelin family, it will not vote to initiate action against A. Hermelin or D. Hermelin or the Executive Defendants or their fellow Board members, all of whom are beholden to Hermelins and do their bidding.  Therefore, demand is futile.

### *The Board is Hopelessly Conflicted and Lacks Independence, Further Confirming the Futility of Demand*

101.    As alleged above, the Director Defendants are not independent.   Given the Hermelin family's overwhelming domination and control of the Company and blood relationship with defendant D. Hermelin, the remaining Director Defendants are beholden to them and would not disinterestedly consider a demand to pursue the claims set forth herein.  Confirming that each of the Director Defendants is beholden to those who control the Company, including the Hermelins (including conflicted defendant D. Hermelin), is that they were placed on the Board by the Hermelins, as well as the substantial amounts of pay that each of the directors receives, and stands to receive, from the Company.   According to the Company's Proxy Statement on Schedule 14A, filed with the SEC on July 26, 2011, the Director Defendants were paid the following amounts for the Company's fiscal year 2011:

- D. Hermelin:     $439,015

- Lehrer:              $380,848

- Dow:                 $135,891

- Stancic:            $126,876

- Sidransky:        $120,998

- Baldini:            $99,334 (prorated per appointment to the Board on July 29, 2010)

- Bentley:            $53,607 (elected to the Board on June 10, 2010)

---

matter related to the release of certain jail records; and (5) the scope of the relevant discovery for the Court's permissive indemnification determinations.  Both the Delaware and St. Louis cases are continuing.)

102.    These amounts paid to the Director Defendants were material to them, and they expect to receive as much, or more, for fiscal year 2012.  Further, such amounts materially exceed customary director fees, particularly with respect to D. Hermelin and Lehrer, and were not deserved (particularly in light of the breaches of fiduciary duty set forth herein).   The excessive compensation paid to the Director Defendants confirms that they are beholden to the Hermelins, and is indicative of the Hermelin family's domination as well as the Company's lack of internal controls and K-V Defendants' breaches of fiduciary duty, and further disables the Director Defendants from independently and disinterestedly considering a demand.

103.    The Compensation Committee of the Board is responsible for discharging the responsibilities of the Board relating to, among other things, compensation arrangements for K-V's executive officers and directors.   The Compensation Committee is comprised of defendants Sidransky, Baldini, Stancic and Dow, with Sidransky the Chairman.  In addition to approving the excessive compensation for themselves and fellow Director Defendants as set forth above, the Compensation Committee Defendants also approved excessive compensation for defendant Divis, which amounted to $385,102 for the Company's fiscal year ended March 31, 2011, and demonstrates their lack of independence from Divis.   As members of K-V's Compensation Committee, defendants Sidransky, Baldini, Stancic and Dow had a special duty to oversee the development and implementation of the compensation programs for senior management and the Board, a duty they obviously abdicated, and for which they face a further substantial likelihood of liability.

104.    During the Relevant Period, defendants Dow, Lehrer and Stancic served on the Audit Committee of the Board, with Dow as its Chairman.  According to the Company's Proxy Statement on Schedule 14A, filed with the SEC on July 26, 2011, the Audit Committee meets

with the Company's "internal auditors, the Board of Directors and management *to monitor the adequacy of reporting, internal controls and compliance* with our policies [and] reviews its annual and interim consolidated financial statements".   Thus, the Audit Committee was admittedly responsible for reviewing the integrity of the Company's internal controls, and in any event, the members of the Audit Committee were required to oversee K-V's legal, accounting and regulatory compliance.  The Audit Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because, *inter alia*, they allowed the Company and Executive Defendants to disseminate materially false and misleading statements to the investing public and caused the internal control failures described herein. In particular, they owed specific duties to K-V to review and approve the Company's earnings press releases and its quarterly and annual financially statements; thus, oversee the "integrity of the Company's financial statements." Further, in their capacity as members of the Audit Committee, defendants Dow, Lehrer, and Stancic reviewed and approved the materially false and misleading quarterly and annual reports in which the Company improperly accounted for liabilities and materially misstated the Company's financial position and results, which the Company ultimately had no choice but to restate.  Because defendants Dow, Lehrer and Stancic, as members of the Audit Committee, knowingly permitted the Company to operate without internal controls, and the consequent disclosure, legal and regulatory failures described herein, each of the Audit Committee Defendants faces a substantial likelihood of liability for their breaches of fiduciary duties and any demand upon them would be futile.

105.    Defendant Bentley is particularly beholden to those who control the Company, including particularly the Hermelins and Executive Defendants.  On June 10, 2010, Bentley was appointed to serve as a member of the Board and, on that date, Bentley accepted an offer to serve

49

as the Company's Senior Vice President, Law during the Company's search for a new permanent General Counsel.  Pursuant to a letter dated October 26, 2010, in the event that Bentley ceases to serve as a director prior to December 31, 2013, other than by his resignation, by declining re-nomination or by re-election, he will continue to provide legal services to the Company for the 12-month period following his termination of service as a director at the minimum annual overwhelming excessive and undeserved rate of $352,800.  This amount of compensation and his lucrative employment agreement with the Company is of material importance to Bentley, and is further evidence of his lack of independence.  Consequently, it is highly unlikely that he would disinterestedly and independently consider a demand to bring a lawsuit to remedy the wrongdoing set forth herein.

106.    Further, demand is excused because the damage to the Company alleged herein is a direct result of the Board's conscious failure to implement internal controls and oversee and manage the Company, which is particularly egregious due to the Company's recent criminal history with respect to ETHEX.  Accordingly, the Board cannot exercise independent objective judgment in deciding whether to bring this action because they are personally interested in the outcome of this lawsuit, as it is their actions that have subjected K-V to liability and harm.

107.    Moreover, any suit by the Company to remedy these wrongs would likely expose the Individual Defendants and K-V to further liability for violations of the federal securities fraud laws, in that it no doubt would result in additional civil actions being filed against the Company and Individual Defendants (and would further strengthen the existing securities fraud class action litigation against the Company and Individual Defendants).  Thus, the Director Defendants are hopelessly conflicted in making any supposedly independent determination of whether the Company should sue themselves, A. Hermelin and the Executive Defendants.

108.    K-V has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein.  Yet, K-V's Board has not authorized the Company to file a lawsuit against Individual Defendants or others who were responsible for the wrongful conduct to attempt to recover for K-V any part of the damages the Company suffered and will suffer thereby.

109.    If the current directors were to cause the Company to bring this action against the Individual Defendants, they would thereby admit their own misconduct in failing to implement internal controls and oversee and manage the Company, which underlies allegations contained in the class action complaints for violations of federal securities law.  Such admissions would impair the defense of the securities fraud class actions and greatly increase the probability that the Company and Individual Defendants will be found to be personally liable in the securities fraud class actions, in an amount likely to be in excess of any insurance coverage available to the Board.  Thus, the Board would be forced to take positions contrary to the defenses they will likely assert in the securities class action litigation.

110.    If the Director Defendants are shielded from personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to K-V and its stockholders.  However, such liability insurance policies would contain provisions that eliminate coverage for any action brought directly by K-V against the Director Defendants, known as the "insured versus insured exclusion".  As a result, if the Director Defendants were to cause K-V to sue themselves or other K-V insiders, there would be no insurance protection and, thus, will not bring such a suit.  If the suit is brought derivatively, as this action is, such coverage exists and will provide a basis for the Company to effectuate

recovery.  If there is no applicable directors' liability insurance, then the Director Defendants will not cause K-V to sue the defendants named herein, since they will face a large uninsured liability.

111.    The misconduct complained of herein could not have been the product of good faith business judgment.  Each of the directors named herein as an Individual Defendant faces a substantial likelihood of liability for breaching their fiduciary duties because, the Director Defendants, through their intentional misconduct, they have subjected K-V to substantial damages.  First, Makena was the Company's primary product; therefore the Director Defendants plainly had a duty to both understand and to approve the Company's statements with respect to Makena.  However, they knowingly permitted Defendants Goedke and Divis and the Company to make false and misleading statements regarding the FDA's supposed obligation to prevent compounding pharmacies from making 17P and the access to Makena used by women. Additionally, they knowingly permitted the Company to understate its liabilities and losses. Furthermore, the conduct of the Board has subjected the Company to substantial potential liability in connection with securities fraud class action litigation.  In particular, through their misconduct, the Board has subjected the Company to a substantial likelihood of material wasteful costs, fines, and adverse judgments associated with the securities fraud class actions (and further litigation likely to be brought, including by aggrieved noteholders who purchased the Company's senior secured notes while the Company's stock was artificially inflated, as discussed above in ¶ 67).

112.    Indeed, as the K-V Defendants admitted in the Form 10-Q the Company filed with the SEC on February 9, 2012, with respect to one aspect of the wasteful costs their misconduct has and will cause the Company to incur, "The restatement process was highly time-

and resource-intensive and involved substantial time and resources from management and may continue to do so.  In addition, the restatement may result in other costs to the Company. Further, many companies that have been required to restate their historical financial statements have experienced a decline in stock price."

113.    The Director Defendants failed to install internal controls, and this failure is particularly egregious with respect to K-V's recent criminal scandal and has cost the Company dearly as it has directly resulted in substantial damage to the Company related to the issuance of materially false and misleading statements and financial results.  Such actions by the Board constitute waste and cannot be protected by the business judgment rule.

114.    Accordingly, for at least all of these reasons, making a pre-suit demand on the Board would be futile and is therefore excused.

115.    Plaintiff has not made a demand on the shareholders of K-V to institute this action because such demand would be a futile and useless act for at least the following reasons:  (a) K-V is a publicly held company with approximately 59.88 million shares outstanding (48,806,824 Class A shares and 11,075,435 Class B shares), and hundreds or thousands of shareholders; (b) making demand on such a large number of shareholders would be impossible for Plaintiff, who has no practical way of learning the names, addresses or phone numbers of all the Company's shareholders; and (c) making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR DISSEMINATING MATERIALLY FALSE AND MISLEADING STATEMENTS, ALLOWING IMPROPER CONDUCT, FAILING TO INSTALL AND MAINTAIN INTERNAL CONTROLS AND FAILING TO OVERSEE AND MANAGE THE COMPANY**

116.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

117.    The Individual Defendants owed and owe to K-V fiduciary obligations.   By reason of their fiduciary relationships, the Individual Defendants specifically owed and continue to owe K-V the highest obligations of good faith, fair dealing, loyalty, candor and due care.

118.    The Individual Defendants breached their fiduciary duties, including their duties of loyalty, good faith, candor, due care, diligence, reasonable inquiry, oversight, and supervision.

119.    The Executive Defendants breached their fiduciary duties by knowingly making materially false and misleading statements to the investing public, while being fully aware that their statements were not true including due to their knowledge of contrary and adverse facts, including the following:  (i) the FDA was not required to enforce K-V's purported exclusivity with respect to Makena; (ii) Makena would not be widely accepted and K-V's pricing plan would not increase access to the drug; and (iii) the Company's liabilities and financial statements were materially misstated.

120.    The Director Defendants breached their fiduciary duties of loyalty, good faith, candor, due care, reasonable inquiry, oversight and supervision to the Company including by consciously failing to implement and maintain internal controls, and causing and allowing the materially false and misleading statements to be made regarding Makena and the Company's business, prospects and liabilities.

121.    The Audit Committee Defendants (Dow, Lehrer, and Stancic), in their capacity running and constituting K-V's Audit Committee, further breached their fiduciary duties of loyalty, good faith, candor, due care, reasonable inquiry, oversight and supervision by approving the statements described herein which were made during their tenure on the Audit Committee, which they must have known contained materially false and misleading statements and

54

omissions.  The Audit Committee Defendants consciously failed to carry out their fiduciary duties, including by knowingly failing to install internal controls and knowingly failing to engage in a good faith review of the Company's financial statements as per the Audit Committee Charter of the Company.

122.   The Compensation Committee Defendants (Sidransky, Baldini, Dow and Stancic), in their capacity running and constituting K-V's Compensation Committee, further breached their fiduciary duties by giving excessive and undeserved compensation to themselves and fellow K-V Defendants while breaching their fiduciary duties.

123.   During the Relevant Period, the K-V Defendants, particularly through D. Hermelin, collectively and individually, initiated a course of conduct that was designed to and did facilitate defendant A. Hermelin's insider sale of more than $1 million worth of his personally held shares on the basis of material, non-public information while the Company's stock was artificially inflated, and by consciously failing to install internal controls that would have prevented such misconduct.

124.   Defendant A. Hermelin breached his fiduciary duties and violated the law by selling the Company's stock on the basis of material non-public information that was misappropriated from K-V.

125.   Defendant D. Hermelin further breached his fiduciary duty of loyalty by providing to defendant A. Hermelin material non-public information belonging to the Company so that A. Hermelin could sell K-V stock at artificially inflated prices.  The information described above was proprietary, material non-public information concerning the Company's business and prospects, and this information was the Company's proprietary asset which D. Hermelin and A. Hermelin were not permitted to misappropriate.

126.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, K-V has sustained substantial damages, not only monetarily, but also to its corporate image and goodwill.

127.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

128.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

129.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused K-V to incur (and K-V likely to continue to incur) significant legal costs to defend itself as a result of the Individual Defendants' unlawful and improper actions, along with investigatory and other costs, including likely many millions of dollars in potential legal liability.  Such incurred and expected liability and costs resulting from the Individual Defendants' misconduct amount to an irrational squandering of K-V's assets for no valid corporate purpose.

130.    As a result of this waste of corporate assets, the Company has been substantially damaged and the Individual Defendants are liable to the Company.

## COUNT III

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

131.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132.    By or in the course of their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of K-V.  The K-V Defendants were unjustly enriched based upon the executive compensation and the director compensation that they received while in the course of breaching their fiduciary duties owed to the Company.

133.    While in possession and on the basis of material, adverse non-public information that caused him to know that the price of K-V stock was artificially inflated, Defendant A. Hermelin unloaded his stock in exchange for an excessive amount of cash.  A. Hermelin wrongfully profited from the misconduct explained herein and was unjustly enriched by the use of material inside information misappropriated from the Company.

134.    Plaintiffs, as representatives of K-V and on its behalf, seek restitution from the Individual Defendants, and each of them, and seek and order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, from or in the course of their wrongful conduct and breaches of their fiduciary duties.

<u>**COUNT IV**</u>

**AGAINST ALL INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMNIFICATION**

135.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

136.    K-V is alleged in federal securities fraud class action lawsuits to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Individual Defendants' liability to K-V, and is likely to be alleged liable to others including noteholders who purchased the Company's senior secured notes while the Company's stock was artificially inflated.

57

137.     K-V's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, disloyal and bad faith acts and omissions of the Individual Defendants as alleged above, and K-V is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, or may in the future be, asserted against the Company by virtue of the Individual Defendants' misconduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.     Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing K-V to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders a vote on a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

1.     A provision to control the disproportionate influence of the Hermelin family over the Board and the Company;

2.     A proposal to strengthen the Company's internal controls, including over financial reporting and public statements;

3.     A proposal to strengthen the Board's supervision of operations and

58

develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

4. A provision to permit the shareholders of K-V to nominate at least three candidates for election to the Board; and

5. A provision to prevent illicit stock sales on the basis of material non-public information, and to prevent the tipping of material non-public information.

C. Awarding to K-V restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants from or in the course of their breaches of fiduciary duty, including all ill-gotten gains from insider selling by defendant A. Hermelin;

D. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all claims set forth herein.

Dated:  February 13, 2012                              CAREY DANIS & LOWE

/s/ James J. Rosemergy
John J. Carey
James Rosemergy
8235 Forsyth Ste 1100
St. Louis, MO 63105
Telephone: (314) 725-7700
Facsimile: (314) 721-0905
Email: jcarey@careydanis.com
                mflannery@careydanis.com
                jrosemergy@careydanis.com

*Attorneys for Plaintiffs Phil and Martha Tompkins*

*Of Counsel:*

LEVI & KORSINSKY, LLP
Joseph Levi, Esq.
Michael H. Rosner, Esq. (*pro hac vice* motion pending)
30 Broad Street, 15th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: mrosner@zlk.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed on February 13, 2012, using the Court's ECF system, and served upon all counsel of record thereby.

/s/ James J. Rosemergy